# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

In re:

Ezequiel Ortega and Maria J. Ortega,

                Debtor.

Case No. 20-00436
Chapter: 13
Hearing Date:
Judge: A. Benjamin Goldgar

## <u>NOTICE MOTION FOR RELIEF FROM STAY</u>

TO:    Glenn B Stearns, Chapter 13 Trustee, 801 Warrenville Road, Suite 650, Lisle, IL 60532 by electronic notice through ECF
Ezequiel Ortega, Debtor, 3230 N Central Park Avenue, Chicago, IL 60618 by regular mail
Maria J. Ortega, Debtor, 3230 N Central Park Avenue, Chicago, IL 60618 by regular mail
David M Siegel, Esq., Attorney for the Debtor, David M. Siegel & Associates, 790 Chaddick Drive, Wheeling, IL 60090 by electronic notice through ECF

PLEASE TAKE NOTICE that on June 2, 2020, at 1:30 p.m., or soon thereafter as counsel may be heard, I shall appear before the Honorable Judge A. Benjamin Goldgar, Bankruptcy Judge, at the Everett McKinley Dirksen Building, 219 South Dearborn Street, Chicago, Illinois, Courtroom 642, or before any other Bankruptcy Judge who may be sitting in his place and stead, and shall then and there present this Motion of the undersigned, a copy of which is attached hereto and herewith served upon you.

PLEASE TAKE FURTHER NOTICE that pursuant to the March 19, 2020 Amended General Order No. 20-03 concerning updated procedures in response to the COVID-19 Public Emergency, this hearing will be conducted telephonically using the service provided by CourtSolutions. To participate in a hearing, you must register for the specific hearing date by contacting Court Solutions at www.Court-Solutions.com or (917) 7467476. Further instruction for telephonic participation can be found on the following website: https://www.ilnb.uscourts.gov/sites/default/files/Announcement-telephonic-hearings.pdf.

PLEASE TAKE FURTHER NOTICE that a party who objects to this motion and wants it called must file a Notice of Objection no later than two (2) business days before the presentment date. If a Notice of Objection is timely filed, the motion will be called on the presentment date. If no Notice of Objection is timely filed, the court may grant the motion without a hearing before the date of presentment.

Dated: May 20, 2020

                By:   __/s/ *Jennifer E. Walker*_____
                     Jennifer E. Walker, Esq.
                     Plunkett Cooney, P.C.
                     221 N. LaSalle Street, Suite 1550
                     Chicago, IL 60601
                     Telephone: (312) 970-6900
                     Email:  jwalker@plunkettcooney.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that I have served a copy of this Notice along with the attached Motion upon the attached list at the address shown and by the method indicated on the list on May 21, 2020 before the hour of 5:00 p.m..

Glenn B. Stearns, Chapter 13 Trustee, 801 Warrenville Road, Suite 650, Lisle, IL 60532 by electronic notice through ECF
Ezequiel Ortega, Debtor, 3230 N Central Park Avenue, Chicago, IL 60618 by regular mail
Maria J. Ortega, Debtor, 3230 N Central Park Avenue, Chicago, IL 60618 by regular mail
David M Siegel, Attorney for the Debtor, David M. Siegel & Associates, 790 Chaddick Drive, Wheeling, IL 60090 by electronic notice through ECF

By: __/s/ *Jennifer E. Walker*____
Jennifer E. Walker, Esq.

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

In re:

Ezequiel Ortega and Maria J. Ortega,

Debtor.

Case No. 20-00436
Chapter: 13
Hearing Date:

Judge: A. Benjamin Goldgar

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY (REAL PROPERTY)

NOW COMES NewRez LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint"), as servicer for 1900 Capital Trust II, by U.S. Bank Trust National Association, not in its individual capacity but solely as Certificate Trustee (the "Movant"), by and through its attorneys, Plunkett Cooney, P.C., and moves this Honorable Court pursuant to 11 U.S.C. §362(d) for an Order granting the Movant relief from the automatic stay with respect to certain real property of the Debtor(s) having an address of 3230 N Central Park Avenue, Chicago, IL 60618 (the "Property"), and in support thereof states as follows:

1.      The Court has jurisdiction pursuant to 28 U.S.C. §1334 and venue is fixed in this Court pursuant to 28 U.S.C. §1409;

2.      The Movant holds a Mortgage and Note dated July 25, 2006, in the original amount of $420,000.00, secured by the Property. (See Mortgage, Note and Assignments of Mortgage attached hereto as Exhibit A and incorporated by reference herein).

3.      On January 7, 2020, Ezequiel Ortega and Maria J. Ortega, (the "Debtors") filed a voluntary petition for relief under Chapter 13 of Title 11 of the United States Bankruptcy Code.

4.      As a result, the enforcement of Movant's security interest has been stayed automatically by operation of 11 U.S.C. §362 of the Bankruptcy Code.

5.      The Debtor's Chapter 13 Plan provides for the cure of the pre-petition arrears of said Mortgage and maintenance of current contractual payments during the pendency of the within bankruptcy case.

6.      As of May 1, 2020, the Debtor has failed to make monthly post-petition payments thereby causing a post-petition default in the amount of $10,349.32.  See breakdown of default provided below:

> Four (4) payments from February 1, 2020 through May 1, 2020 in the amount of $2,587.33/mo., less suspense ($0.00) = $10,349.32

7.      Cause exits for relief from the automatic stay pursuant to 11 U.S.C. §362(d)(1) as a result of the Debtor's failure to make monthly post-petition mortgage payments.

8.      Movant further requests that the Court order that Rule 4001(a)(3) is not applicable to the Order entered in granting this Motion.

9.      Shellpoint services the underlying mortgage loan and note for the Property referenced in this Motion for the Movant and is entitled to proceed accordingly.  Should the automatic stay be lifted and/or set aside by Order of this Court or if this case is dismissed or if the Debtor obtains a discharge and a foreclosure action is commenced or recommended, said foreclosure action will be conducted in the name of the Movant.  The Movant has the right to foreclose because: the Movant is the original mortgagee or beneficiary or assignee of the security instrument for the referenced loan.  The Movant directly or through an agent has possession of the promissory note and the promissory note is either made payable to the Movant or has been duly endorsed.

10.     The subject note and mortgage is signed by Ezequiel Ortega and Maria J. Ortega and that to the extent it applies to Ezequiel Ortega and Maria J. Ortega and grounds exist for relief.

**WHEREFORE**, the Movant prays this Court enter an Order granting the Movant relief from the automatic stay pursuant to 11 U.S.C. Section 362(d) of the Bankruptcy Code to permit the Movant to proceed under the law, and for such other further relief as this Court may deem just and proper.

Dated this May 21, 2020

Respectfully Submitted,

By:  /s/ *Jennifer E. Walker*
       Jennifer E. Walker, Esq.
       Plunkett Cooney, P.C.
       221 N. LaSalle Street, Suite 1550
       Chicago, IL 60601
       Telephone: (312) 970-6900
       Email: jwalker@plunkettcooney.com

Form G-4

**REQUIRED STATEMENT
TO ACCOMPANY MOTIONS FOR RELIEF FROM STAY**

All Cases:        Debtor(s) <u>Ezequiel Ortega and Maria Ortega</u> Case No. <u>20-00436</u>        Chapter 13

All Cases:        Moving Creditor <u>1900 Capital Trust II, by U.S. Bank Trust National Association</u> Date Case Filed 01/07/2020

Nature of Relief Sought: ☑ Lift Stay                ☐ Annual Stay                ☐ Other (describe) _____

Chapter 13: Date of Confirmation Hearing <u>05/01/2020</u> or Date Plan Confirmed <u>05/01/2020</u>

Chapter 7:        ☐ No-Asset Report Filed On _____
                  ☐ No-Asset Report not Filed, Date of Creditors Meeting _____

1.  Collateral
    a.  ☑ Home
    b.  ☐ Car Year, Make and Model_____
    c.  ☐ Other (describe) _____

2.  Balance Owed as of Petition Date: <u>$605,620.91</u>
    Total of all other Liens against Collateral <u>$605,620.91</u>

3.  In chapter 13 cases, if a post-petition default is asserted in the motion, attach a payment history listing the
    amounts and dates of all payments received from the debtor(s) post-petition.

4.  Estimated Value of Collateral (must be supplied in all cases) $<u>515,000.00</u>

5.  Default
    a.  ☐        Pre-Petition Default
                 Number of Months _____        Amount: $_____

    b.  ☑        Post-Petition Default
                 i.    ☑ On direct payments to the moving creditor
                       Number of Months <u>4</u>        Amount: $<u>2,587.33</u>        Total: $<u>10,349.32</u>

                 ii.   ☐ On payments to the Standing Chapter 13 Trustee
                       Number of Months _____        Amount $_____

6.  Other Allegations
    a.  ☐ Lack of Adequate Protection § 362(d)(2)
        i.    ☐ No insurance
        ii.   ☐ Taxes unpaid   Amount  $_____
        iii.  ☐ Rapidly depreciating asset
        iv.   ☐ Other (describe) _____

    b.  ☐ No Equity and not Necessary for an Effective Reorganization § 362(d)(2)
    c.  ☐ Other "Cause" § 362(d)(1)
        i.    ☐ Bad Faith (describe) _____
        ii.   ☐ Multiple Filings _____
        iii.  ☐ Other (describe) _____

    d.  Debtor's Statement of Intention regarding the Collateral
        i.    ☐ Reaffirm    ii. ☐ Redeem    iii. ☐ Surrender    iv. ☑ No Statement of Intention Filed

Date: ____05/21/2020_____                        _____/s/ Jennifer E. Walker_____
                                                  Counsel for Movant

# PAYMENT HISTORY

| Debtors: | Ezequiel Ortega and Maria J. Ortega |
|---|---|
| Case No: | 20-00436 |
| Filing Date: | 01/07/2020 |
| Post First Due: | 02/01/2020 |

| Date Payment Due | Amount of Payment Due | Principal and Interest | Escrow | Amount Received | Amount Due |
|---|---|---|---|---|---|
| 02/01/2020 | $2,587.33 | $1,770.65 | $816.68 | $0.00 | $2,587.33 |
| 03/01/2020 | $2,587.33 | $1,770.65 | $816.68 | $0.00 | $2,587.33 |
| 04/01/2020 | $2,587.33 | $1,770.65 | $816.68 | $0.00 | $2,587.33 |
| 05/01/2020 | $2,587.33 | $1,770.65 | $816.68 | $0.00 | $2,587.33 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| TOTAL DUE: $10,349.32 | | | | | |

Open.27844.01539.24150280-1

 

# NOTE

July 25, 2006
[Date]

[City]

IL
[State]

3230 N CENTRAL PARK AVE, CHICAGO, IL 60618
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $   420,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
JPMORGAN CHASE BANK, N.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   7.375 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first  day of each month beginning on September 1, 2006 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on August 1, 2036       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. BOX 79046
PHOENIX, AZ 85062-9046                            or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $   2,900.84

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT



-5N (0006)              Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3                    Initials: E.O



## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be          5.000    % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.



Form 3200 1/01
Initials: _E ¿ Ò_

_/¹/ (_

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Ezequiel Ortega_ _____ (Seal)
EZEQUIEL ORTEGA                    -Borrower
Social Security No.: ███████████

_____ (Seal)
                                    -Borrower

_Maria Ortega_ _____ (Seal)
MARIA ORTEGA                       -Borrower
Social Security No.: ███████████

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

Pay to the Order of:
Without Recourse
JPMorgan Chase Bank USA, N.A.
By: _Tamara Benard_
     Tamara Benard/Vice President

Pay to the Order of:
Without Recourse
JPMorgan Chase Bank, N.A.
BY: _Peggy Moffett_
     PEGGY MOFFETT/ASSISTANT SECRETARY

[Sign Original Only]

Allonge

| | | | |
|---|---|---|---|
| **Borrower(s):** | ORTEGA EZEQUIEL | **Loan Amount:** | $420,000.00 |
| | 3230 N CENTRAL PARK AVE | **Loan #:** | |
| | CHICAGO, IL 60618 | **Note Date:** | 7/25/2006 |

**PAY TO THE ORDER OF:**

Chase Home Finance, LLC

**without recourse this 9/25/2006**

JP Morgan Chase Bank, N.A.

an Ohio Corporation

Angela Nolan

Assistant Vice President

Return To:

CHASE HOME FINANCE,LLC.
1040 OLIVER ROAD
MONROE, LA  71201

Doc#:  0620940095 Fee: $60.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 07/28/2006 03:13 PM  Pg:  1 of 19

ATTENTION:   CUSTODY SERVICES

Prepared By: ELLOUISE SHIRLEY

————————————— —[Space Above This Line For Recording Data]———

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated       July 25, 2006                ,
together with all Riders to this document.
(B) **"Borrower"** is
EZEQUIEL ORTEGA,
MARIA ORTEGA, HUSBAND & WIFE

Borrower is the mortgagor under this Security Instrument.
(C) **"Lender"** is  JPMORGAN CHASE BANK, N.A.

Lender is a  BANK
organized and existing under the laws of  the U.S.A.

*194C*

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT            Form 3014  1/01

VMP -6(IL) (0010)
Page 1 of 15         Initials: E.O

VMP MORTGAGE FORMS - (800)521-7291
         M O



Lender's address is   1111 POLARIS PARKWAY
                      COLUMBUS OH 43240

Lender is the mortgagee under this Security Instrument.

**(D) "Note"** means the promissory note signed by Borrower and dated   July 25, 2006
The Note states that Borrower owes Lender
Four Hundred Twenty Thousand, and 00/100                                          Dollars
(U.S. $   420,000.00   ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than   August 1, 2036                 .

**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☒ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Escrow Items"** means those items that are described in Section 3.

**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, the following described property located in the
[Type of Recording Jurisdiction]
                    COUNTY
of   COOK                              [Name of Recording Jurisdiction]:


LOT 10 IN BLOCK 1 IN BELMONT AND NORTH CENTRAL PARK AVENUE ADDI-
TION, A SUBDIVISION OF THE SOUTH 1/2 OF THE SOUTHEAST 1/4 OF THE
SOUTHWEST 1/4 OF SECTION 23, TOWNSHIP 40 NORTH, RANGE 13, EAST
OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.


Parcel ID Number:   13-23-332-025-0000                which currently has the address of
                    3230 N CENTRAL PARK AVE                              [Street]
                    CHICAGO                   [City], Illinois   60618      [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."
    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.



VMP®-6(IL) (0010)              Page 3 of 15        Initials: *E.O*        Form 3014  1/01
                                                   *M O*

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

 -6(IL) (0010)                Page 6 of 15        Initials:         Form 3014   1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Initials:  

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full,  and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**



**(b)** Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender


-6(IL) (0010)

Page 9 of 15

Initials: 

Form 3014   1/01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

 

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

Initials: _E. O_
_M O_

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22.  Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23.  Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24.  Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

**25.  Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _____ (Seal)
                                                                      -Borrower


_____    _____ (Seal)
                                                                      -Borrower


_Ezequiel Ortega_ (Seal)              _____ (Seal)
EZEQUIEL ORTEGA          -Borrower                                    -Borrower


_Maria Ortega_ (Seal)                 _____ (Seal)
MARIA ORTEGA             -Borrower                                    -Borrower


_____ (Seal)    _____ (Seal)
                            -Borrower                                    -Borrower


VMP®-6(IL) (0010)                    Page 14 of 16                    Form 3014   1/01

**STATE OF ILLINOIS,** _Esther ALFARO-Giler_ _CCOK_ **County ss:**

I, , a Notary Public in and for said county and
state do hereby certify that
EZEQUIEL ORTEGA,
MARIA ORTEGA, HUSBAND & WIFE

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument,
appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said
instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this    25th       day of   July, 2006       .

My Commission Expires: _5/5/08_

_Esther Alfaro-Giler_
Notary Public

"OFFICIAL SEAL"
ESTHER ALFARO-GILER
COMMISSION EXPIRES 05/05/08

Initials: _E.O_
_M O_

Form 3014   1/01



# 1-4 FAMILY RIDER
## Assignment of Rents

THIS 1-4 FAMILY RIDER is made this 25th day of July, 2006 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to

JPMORGAN CHASE BANK, N.A.
, organized and existing under the laws of the U.S.A.
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

3230 N CENTRAL PARK AVE, CHICAGO, IL 60618

Property Address

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the property described in the Security Instrument, the following items now or hereafter attached to the property to the extent they are fixtures are added to the property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, panelling and attached floor coverings now or hereafter attached to the Property, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by this Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on

MULTISTATE 1-4 FAMILY RIDER
C-6015LT (1/05) Page 1 of 4 (Replaces 2/00)

Form 3170 3/99

a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Uniform Covenant 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Uniform Covenant 19 is deleted.

**F. BORROWER'S OCCUPANCY.** With regard to non-owner occupied investment properties, the first sentence in Uniform Covenant 6 concerning Borrower's occupancy of the Property is deleted. For all properties, all remaining covenants and agreements set forth in Uniform Covenant 6 shall remain in effect.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request, after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this Paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However,

MULTISTATE 1-4 FAMILY RIDER                                                                          Form 3170 3/99
C-6015LT (1/05)  Page 2 of 4 (Replaces 2/00)

Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Paragraph 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the cost of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Uniform Covenant 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not and will not perform any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

   **I.  CROSS-DEFAULT PROVISION.**  Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument

and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

EZEQUIEL ORTEGA                              MARIA ORTEGA

MULTISTATE 1-4 FAMILY RIDER
C-6015LT (1/05)  Page 4 of 4 (Replaces 2/00)

Form 3170 3/99

Doc#:  1307239064 Fee: $56.00
Karen A. Yarbrough RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 03/13/2013 01:18 PM Pg: 1 of 10

Recording Requested By/Return To:
**JPMORGAN CHASE BANK, N.A.**
**CHASE RECORDS CENTER**
**RE: COLLATERAL TRAILING**
**DOCUMENTS**
**PO BOX 8000**
**MONROE, LA 71203**

This Instrument Prepared By:
**JPMORGAN CHASE BANK, N.A.**
**3415 VISION DRIVE**
**COLUMBUS, OHIO 43219-6009**

——————————— [Space Above This Line For Recording Data] ———————————

# HOME AFFORDABLE MODIFICATION AGREEMENT

**Loan Number**

Borrower ("I"):[1] **EZEQUIEL ORTEGA AND MARIA ORTEGA HUSBAND AND WIFE**
Lender or Servicer ("Lender"): **JPMORGAN CHASE BANK, NA**
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): **JULY 25, 2006**
Loan Number:
Property Address ("Property"): **3230 N CENTRAL PARK AVE, CHICAGO, ILLINOIS 60618**
**LEGAL DESCRIPTION:**
**THE LAND REFERRED TO IN THIS POLICY IS SITUATED IN THE STATE OF ILLINOIS, COUNTY OF COOK, CITY OF CHICAGO, AND DESCRIBED AS FOLLOWS: LOT 10 IN BLOCK 1 IN BELMONT AND NORTH CENTRAL PARK AVENUE ADDITION, A SUBDIVISION OF THE SOUTH 1/2 OF THE SOUTHEAST 1/4 OF THE SOUTHWEST 1/4 OF SECTION 23, TOWNSHIP 40 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS. APN: 13-23-332-025-0000**

**REFERENCE NUMBERS OF DOCUMENTS MODIFIED:**
**RECORDED JULY 28, 2006 INSTRUMENT NO. 0620940095**

**Tax Parcel No: 13-23-332-025-0000**

If my representations and covenants in Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and

———————————————

[1] If more than one Borrower or Mortgagor is executing this document, each is referred to as "I." For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac  UNIFORM INSTRUMENT    ver. 01_30_2013_11_06_47    OP362/Form 3157  3/09 (rev. 7/12)(CHF rev. 07/12)

*(page 1 of 10 pages)*

S  N
P  10
S  N
M  N
SC  Y
E  1
INT  OK

**Loan Number**

supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a signed copy of this Agreement. This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1. **My Representations and Covenants**. I certify, represent to Lender, covenant and agree:

   A. I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents or my default is imminent, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

   B. The Property has not been condemned;

   C. There has been no impermissible change in the ownership of the Property since I signed the Loan Documents. A permissible change would be any transfer that the lender is required by law to allow, such as a transfer to add or remove a family member, spouse or domestic partner of the undersigned in the event of a death, divorce or marriage;

   D. I have provided documentation for **all** income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification Program ("Program"));

   E. Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

   F. If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and

   G. I have made or will make all payments required under a trial period plan.

   H. If I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the Loan Documents, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement.

2. **Acknowledgements and Preconditions to Modification**. I understand and acknowledge that:

   A. If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that any of my representations in Section 1 are no longer true and correct or any covenant in Section 1 has not been performed, the Loan Documents will not be modified and this Agreement will terminate. In that event, the Lender will have all of the rights and remedies provided by the Loan Documents; and

   B. I understand that the Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand

JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac  UNIFORM INSTRUMENT    ver. 01_30_2013_11_06_47    OP362/Form 3157  3/09 (rev. 7/12)(CHF rev. 07/12)

*(page 2 of 10 pages)*

**Loan Number** ████████████

and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3.    **The Modification**. If my representations and covenants in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on **MARCH 01, 2013** (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a trial period plan, this modification will not take effect. The first modified payment will be due on **MARCH 01, 2013**.

A.   The Maturity Date will be: **FEBRUARY 01, 2053**.

B.   The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan. The new principal balance of my Note will be **$560,858.89** (the "New Principal Balance"). I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid Interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C.   **$83,300.00** of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and I will not pay interest or make monthly payments on this amount. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is **$477,558.89**. Interest at the rate of **2.000%** will begin to accrue on the Interest Bearing Principal Balance as of **FEBRUARY 01, 2013** and the first new monthly payment on the Interest Bearing Principal Balance will be due on **MARCH 01, 2013**. My payment schedule for the modified Loan is as follows:

JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac  UNIFORM INSTRUMENT    ver. 01_30_2013_11_06_47    OP362/Form 3157  3/09 (rev. 7/12)(CHF rev. 07/12)

*(page 3 of 10 pages)*

Loan Number

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins on | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1-5 | 2.000% | 02/01/2013 | $1,446.17 | $858.69 May adjust periodically | $2,304.86 May adjust periodically | 03/01/2013 | 60 |
| 6 | 3.000% | 02/01/2018 | $1,680.11 | May adjust periodically | May adjust periodically | 03/01/2018 | 12 |
| 7-40 | 3.375% | 02/01/2019 | $1,770.65 | May adjust periodically | May adjust periodically | 03/01/2019 | 408 |

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable, step, or simple interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified Loan will be the minimum payment that will be due each month for the remaining term of the Loan.  My modified Loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest being added to the outstanding principal balance.

D.  I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E.  If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

F.  I agree to pay in full the Deferred Principal Balance and any other amounts still owed under the Loan Documents by the earliest of:  (i) the date I sell or transfer an interest in the Property, (ii) the date I pay the entire Interest Bearing Principal Balance, or (iii) the Maturity Date.

JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac  UNIFORM INSTRUMENT    ver. 01_30_2013_11_06_47    OP362/Form 3157  3/09 (rev. 7/12)(CHF rev. 07/12)

*(page 4 of 10 pages)*

Loan Number ▮▮▮▮▮▮▮▮▮

G.  If I make a partial prepayment of Principal, the Lender may apply that partial prepayment first to any Deferred Principal Balance before applying such partial prepayment to other amounts due.

4.    **Additional Agreements**. I agree to the following:

A.  That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B.  That this Agreement shall supersede the terms of any modification, forbearance, trial period plan or other workout plan that I previously entered into with Lender.

C.  To comply, except to the extent that they are modified by this Agreement or by the United States Bankruptcy Code, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D.  That, if I am in bankruptcy upon execution of this document, I will cooperate fully with Lender in obtaining any required bankruptcy court and trustee approvals in accordance with local court rules and procedures. I understand that if such approvals are not received, then the terms of this Agreement will be null and void. If this Agreement becomes null and void, the terms of the original Loan Documents shall continue in full force and effect and such terms shall not be modified by this Agreement.

E.  Intentionally Deleted.

F.  That the Loan Documents as modified by this Agreement are duly valid, binding agreements, enforceable in accordance with their terms.

G.  That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement or by the United States Bankruptcy Code, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

H.  That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. Lender shall not exercise this option

JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac  UNIFORM INSTRUMENT    ver. 01_30_2013_11_06_47    OP362/Form 3157  3/09 (rev. 7/12)(CHF rev. 07/12)

*(page 5 of 10 pages)*

Loan Number ██████████

if state or federal law, rules or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

I.   That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

J.   That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

K.   That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage Loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

L.   That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or a letter agreement containing the correction will be provided to me for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective document, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification Program.

M.   Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS. In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie
Mae/Freddie Mac  UNIFORM INSTRUMENT    ver. 01_30_2013_11_06_47    OP362/Form 3157  3/09 (rev. 7/12)(CHF rev.
07/12)

*(page 6 of 10 pages)*

**Loan Number** ███████

N.  That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity.    In addition, I understand and consent to the disclosure of my personal information and the terms of the trial period plan and this Agreement by Lender to (i) the U.S. Department of the Treasury, (ii) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (iii) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (iv) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (v) any HUD certified housing counselor.

O.  That if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the Note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the Note. All documents the Lender requests of me under this Section 4.O. shall be referred to as "Documents."   I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

P.  That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

Q.  If my Loan Documents govern a home equity loan or line of credit, then I agree that as of the Modification Effective Date, I am terminating my right to borrow new funds under my home equity loan or line of credit.  This means that I cannot obtain additional advances, and must make payments according to this Agreement.  (Lender may have previously terminated or suspended my right to obtain additional advances under my home equity loan or line of credit, and if so, I confirm and acknowledge that no additional advances may be obtained.)

(SIGNATURES CONTINUE ON FOLLOWING PAGES)

JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT -- Single Family -- Fannie
Mae/Freddie Mac  UNIFORM INSTRUMENT    ver. 01_30_2013_11_06_47    OP362/Form 3157  3/09 (rev. 7/12)(CHF rev.
07/12)

*(page 7 of 10 pages)*

Loan Number

## TO BE SIGNED BY BORROWER ONLY

**BORROWER** SIGNATURE PAGE TO HOME AFFORDABLE MODIFICATION AGREEMENT BETWEEN JPMORGAN CHASE BANK, NA And EZEQUIEL ORTEGA AND MARIA ORTEGA HUSBAND AND WIFE, LOAN NUMBER 1609176510 WITH A MODIFICATION EFFECTIVE DATE OF March 01, 2013

In Witness Whereof, the Borrower(s) have executed this agreement.

Borrower - **EZEQUIEL ORTEGA**        Date: 2,15,13

Borrower - **MARIA ORTEGA**        Date: 2,15,13

State of **ILLINOIS**          )
                              ) ss.
County of _Lake_              )

This instrument was acknowledged before me on _February 15_
_2013_ by **EZEQUIEL ORTEGA and MARIA ORTEGA.**

"OFFICIAL SEAL"
Michael Boyle
Notary Public, State of Illinois
Lake County
My Commission Expires 10-12-2014

(SEAL)

Signature of Notary Public
Typed or printed name:
_Michael Boyle_

My Commission expires: _10-12-2014_

JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac  UNIFORM INSTRUMENT   ver. 01_30_2013_11_06_47   OP362/Form 3157  3/09 (rev. 7/12)(CHF rev. 07/12)

*(page 8 of 10 pages)*

**Loan Number** ███████

## TO BE SIGNED BY LENDER ONLY

**LENDER** SIGNATURE PAGE TO HOME AFFORDABLE MODIFICATION AGREEMENT BETWEEN JPMORGAN CHASE BANK, NA And EZEQUIEL ORTEGA AND MARIA ORTEGA HUSBAND AND WIFE, LOAN NUMBER ███████ WITH A MODIFICATION EFFECTIVE DATE OF March 01, 2013

In Witness Whereof, the Lender has executed this Agreement.

Lender

**JPMORGAN CHASE BANK, NA**

By: _____

Printed Name:    Taccara Evans
                 Vice President

Date: _____2.28.13_____

JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac  UNIFORM INSTRUMENT    ver. 01_30_2013_11_06_47    OP362/Form 3157  3/09 (rev. 7/12)(CHF rev. 07/12)

*(page 9 of 10 pages)*

**Loan Number**

State of COLORADO
County of DENVER

The foregoing instrument was acknowledged before me this _2̶8̶_ day of _Feb_____,
2̶0̶1̶3̶ by _Uaccara Evans____, Vice President of JPMORGAN CHASE BANK,
NA, a national banking association.

_Siavon Moore_____

SIAVON MOORE
NOTARY PUBLIC
[SEAL] STATE OF COLORADO
MY COMMISSION EXPIRES 1-27-2015

(signature of person taking acknowledgment)
Printed Name:

_Notary_____
(title or rank)

_____
(serial number, if any)

My Commission expires: __1·27·15__

JPMC MODIFIED MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie
Mae/Freddie Mac  UNIFORM INSTRUMENT   ver. 01_30_2013_11_06_47   OP362/Form 3157 3/09 (rev. 7/12)(CHF rev.
07/12)

*(page 10 of 10 pages)*

When Recorded Return To:
JPMorgan Chase Bank
C/O Nationwide Title Clearing, Inc.
2100 Alt. 19 North
Palm Harbor, FL 34683

Loan Number ▬▬▬▬▬
Pipeline ID M-388

Karen A. Yarbrough
Cook County Recorder of Deeds
Date: 03/20/2017 10:42 AM Pg: 1 of 2

## ASSIGNMENT OF MORTGAGE

**FOR GOOD AND VALUABLE CONSIDERATION**, the sufficiency of which is hereby acknowledged, the undersigned, **JPMORGAN CHASE BANK, N.A., WHOSE ADDRESS IS 700 Kansas Lane, MC 8000, MONROE, LA 71203,** (ASSIGNOR), by these presents does convey, grant, assign, transfer and set over the described Mortgage with all interest secured thereby, all liens, and any rights due or to become due thereon to **SPECIALIZED LOAN SERVICING LLC, A DELAWARE LIMITED LIABILITY COMPANY, WHOSE ADDRESS IS 8742 LUCENT BLVD, SUITE 300, HIGHLANDS RANCH, CO 80129, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).**

Said Mortgage is dated 07/25/2006, and made by **EZEQUIEL ORTEGA AND MARIA ORTEGA** to **JPMORGAN CHASE BANK, N.A.** and recorded 07/28/2006 in the records of the Recorder or Registrar of Titles of **COOK** County, **Illinois**, in **Document # 0620940095**. Upon the property situated in said State and County as more fully described in said Mortgage or herein to wit:
SEE ATTACHED EXHIBIT A

Modification: DATED DATE: 02/15/2013 REC DATE: 03/13/2013 INST# 1307239064.

Tax Code/PIN: 13-23-332-025-0000

Property is commonly known as: 3230 N CENTRAL PARK AVE, CHICAGO, IL 60618.

Dated on _03 / 15 / 2017_ (MM/DD/YYYY)
JPMORGAN CHASE BANK, N.A.

By: _____
        Latrice Bell
        Vice President

STATE OF LOUISIANA    PARISH OF OUACHITA
On _03 / 15 / 2017_ (MM/DD/YYYY), before me appeared _____Latrice Bell_____, to me personally known, who did say that he/she/they is/are the _____Vice President_____ of JPMORGAN CHASE BANK, N.A. and that the instrument was signed on behalf of the corporation (or association), by authority from its board of directors, and that he/she/they acknowledged the instrument to be the free act and deed of the corporation (or association).

_____
YOLANDA A. DIAZ
Notary Public - State of LOUISIANA
Commission expires: Upon My Death

YOLANDA A. DIAZ
STATE OF LOUISIANA
LIFETIME COMMISSION
NOTARY ID #87401

Document Prepared By: _____Latrice Bell_____, JPMorgan Chase Bank, N.A., 780 Kansas Lane, Suite A, Monroe, LA, 71203, 800-401-6587
JPMC2 398223435 FHLMC VPC - SLS_MSR   T021703-10:14:09 [C-1] FRMIL1

1707849101 Page: 2 of 2

# Exhibit A

LOT 10 IN BLOCK 1 IN BELMONT AND NORTH CENTRAL PARK AVENUE ADDI-
TION, A SUBDIVISION OF THE SOUTH 1/2 OF THE SOUTHEAST 1/4 OF THE
SOUTHWEST 1/4 OF SECTION 23, TOWNSHIP 40 NORTH, RANGE 13, EAST
OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

This Instrument Prepared By:
**TIA LABADIE**
After Recording Return To:
**COMPUTERSHARE TITLE SERVICES**
**c/o VISIONET SYSTEMS INC.**
**183 INDUSTRY DRIVE**
**PITTSBURGH, PA 15275**
Voice: **1-(412) 927-0226**

Edward M. Moody
Cook County Recorder of Deeds
Date: 03/27/2019 09:49 AM Pg: 1 of 1

## Assignment of Mortgage

ORDER #

For value received, the undersigned, hereby grants, assigns, and transfers to: **1900 Capital Fund II, LLC** all beneficial interest under that certain Mortgage dated July 25, 2006 executed by:

Borrower: EZEQUIEL ORTEGA, MARIA ORTEGA, HUSBAND & WIFE

For JPMORGAN CHASE BANK, N.A., whose address is 1111 POLARIS PARKWAY COLUMBUS OH 43240 in the amount of: $420,000.00, recorded 07/28/2006 as Instrument No.: 0620940095 of the Official Records of Cook County Recorder, Illinois

Property Address: 3230 N CENTRAL PARK AVE, CHICAGO, ILLINOIS 60618
Tax Parcel ID: 13-23-332-025-0000

**Legal Description**
LOT 10 IN BLOCK 1 IN BELMONT AND NORTH CENTRAL PARK AVENUE ADDITION, A SUBDIVISION OF THE SOUTH 1/2 OF THE SOUTHEAST 1/4 OF THE SOUTHWEST 1/4 OF SECTION 23, TOWNSHIP 40 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Effective date: _1-8-2019_

**SPECIALIZED LOAN SERVICING LLC**

By: _Scott Slagle_
**SCOTT SLAGLE**
**ASSISTANT VICE PRESIDENT**

State of **PENNSYLVANIA**
County of **ALLEGHENY**

On _1-8-2019_ before me, Autumn R Carnegie the undersigned, a Notary Public in and for the county of ALLEGHENY in the State of Pennsylvania, personally appeared Scott Slagle, ASSISTANT VICE PRESIDENT personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that for his/her signature on the instrument the person, or the entity upon behalf of which he/she acted, executed the instrument.

**Autumn R Carnegie**
My Commission Expires: **06/06/2020**

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
AUTUMN R CARNEGIE
Notary Public
FINDLEY TWP, ALLEGHENY COUNTY
My Commission Expires Jun 6, 2020

October 4, 2018  09:19:33 AM
Rec: $15.00
FILED IN GREENVILLE COUNTY, SC  *Timothy J Kenny*

## LIMITED POWER OF ATTORNEY

**1900 Capital Trust II** ("Grantor") has engaged New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") to service a portfolio(s) of loans. Grantor's behalf (the "Assets") pursuant to that certain Servicing Agreement dated as of September 18, 2018 between Grantor and Shellpoint (the "Agreement"). Grantor provides this Limited Power of Attorney to Shellpoint to give Shellpoint the authority to service the Assets.

Now, therefore, Grantor does hereby constitute and appoint Shellpoint the true and lawful attorney-in-fact of Grantor and in Grantor's name, place and stead for the following purposes:

a.  receive, endorse and collect all checks or other instruments and satisfactions of Mortgage Loan or other security instruments;

b.  executing any to assign or endorse any Mortgage, deed of trust, promissory note or other instrument related to the Mortgage Loans;

c.  correct any assignment, mortgage, deed of trust or promissory note or other instrument related to the Mortgage Loans;

d.  complete and execute lost note affidavits or other lost document affidavits related to the Mortgage Loans;

e.  issue title requests and instructions related to the Mortgage Loans;

f.  declare defaults with respect to a Mortgage Loan or Mortgaged Property;

g.  give notices of intention to accelerate and of acceleration and of any notice as reasonably necessary or appropriate;

h.  post all notices as required by law and the Mortgage Loan Documents, including the debt instruments and the instruments securing a Mortgage Loan in order to foreclose or otherwise enforce the security instruments;

i.  pursue appropriate legal action and conduct of the foreclosure or other form of sale and/or liquidation, issue binding instructions with respect to such sale, executing all documents including all deeds and conveyances necessary to effect such sale and/or liquidation; *provided* that the Servicer shall not initiate any action, suit or proceeding solely Client's name without indicating Servicer's representative capacity;

j.  conduct eviction or similar dispossessory proceedings;

k.  take possession of collateral on behalf of Client;

l.  execute any documents or instruments necessary for the offer, listing, closing of sale, and conveyance of Mortgaged Property by foreclosure or other process, including but not limited to grant, warranty, quit claim and statutory deeds or similar instruments of conveyance;

m.  execute any documents or instruments in connection with any bankruptcy or receivership of an obligor or mortgagor on a Mortgage Loan;

n.  file suit and prosecute legal actions against all parties liable for amounts due under a Mortgage Loan, including but not limited to, any deficiency amounts due following foreclosure or other acquisition or disposition of Mortgaged Property;

o.  execute all necessary documents to file claims with insurers on behalf of Client;

p.  assign, convey, accept, or otherwise transfer the interest in any Mortgaged Property on behalf of Client; and

q.  take such other actions and exercise such rights which may be taken by Client with respect to any Mortgaged Property, including but not limited to, realization upon all or any part of a Mortgage Loan or any collateral therefor or guaranty thereof.

Grantor further grants to Shellpoint as its attorney-in-fact full authority to act in any manner both proper and necessary to exercise the foregoing powers, and ratifies every act that Shellpoint may lawfully perform in exercising those powers by virtue thereof.

This Limited Power of Attorney shall be effective as of the date executed below (the "Effective Date)."

This Limited Power of Attorney shall expire two (2) years from the Effective Date.

IN WITNESS THEREOF, Grantor has executed this Limited Power of Attorney this <u>18th</u>    day of <u>September</u> , 2018.

Grantor: 1900 Capital Trust II

Witnessed by:

By: MCM Capital, LLC, its administrator

By: _____

Name: Michael Niccolini

Title: President

1. _____

2. _____

STATE OF <u>Maryland</u>                    COUNTY OF <u>Montgomery</u>

On this 18th day of September 2018, before me, the undersigned, a Notary Public in and for said State, personally appeared <u>Michael Niccolini</u>, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he or she executed the same in his or her authorized capacity, and that by his or her signature on the instrument the entity, on behalf of which the person acted, executed the instrument.

(Seal)

JAMIE L. MERTZ
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
MY COMMISSION EXPIRES 6-12-2022

Notary Public: _____

Date: 9|18|2018



# Delaware

Page 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF AMENDMENT OF "NEW PENN FINANCIAL,

LLC", CHANGING ITS NAME FROM "NEW PENN FINANCIAL, LLC" TO

"NEWREZ LLC", FILED IN THIS OFFICE ON THE NINTH DAY OF OCTOBER,

A.D. 2018, AT 4:57 O`CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF

THE AFORESAID CERTIFICATE OF AMENDMENT IS THE SEVENTH DAY OF

JANUARY, A.D. 2019.



Jeffrey W. Bullock, Secretary of State

4336363  8100
SR# 20187059692

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 203582539
Date: 10-10-18

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:57 PM 10/09/2018
FILED 04:57 PM 10/09/2018
SR 20187059692 - File Number 4336363

# STATE OF DELAWARE
# CERTIFICATE OF AMENDMENT

1.    Name of Limited Liability Company: New Penn Financial, LLC

2.    The Certificate of Formation of the limited liability company is hereby amended
as follows:

Legal name change. New Penn Financial, LLC's new legal name will be
NewRez LLC effective January 7, 2019.

**IN WITNESS WHEREOF**, the undersigned have executed this Certificate on
the _____3RD_____ day of _____October_____, A.D._2018_.

By: _____
                Authorized Person(s)

Name: Kevin Patrick Harrigan    President and CEO - Origination Division;
                                 Board of Managers

                Print or Type